**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 31, 2008

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v                                                                No. 134682

GARY THOMAS SMITH,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

KELLY, J.

At issue in this case is whether the trial judge fulfilled his obligation to articulate a substantial and compelling rationale for the sentences that he imposed. For each conviction, defendant's minimum sentence was an extreme upward departure from the range set by the sentencing guidelines. We conclude that the judge articulated adequate reasons to support *a* departure, but failed to justify the extent of this departure.

We hold that the departure was an abuse of discretion because the trial judge did not establish why the sentences imposed were proportionate to the offense and the offender. Therefore, we vacate defendant's sentences and we

remand this case to the trial judge for resentencing and articulation of the rationale for the extent of any departure made on remand.

FACTS AND PROCEDURAL HISTORY

This is a case involving sexual abuse of a child.  The victim's mother began taking the victim to defendant's home for day care when she was one year old.  Over time, the mother developed a friendship with defendant and with his wife.  The victim, whose family life was fatherless, chaotic, and disorganized, began to see defendant as a father figure.  When the mother was sent to a halfway house for nine months for drug abuse, the victim and her younger sister moved into defendant's home.  Eventually, the mother moved to Atlanta, Georgia, taking her children with her.  However, the families stayed in touch and remained close.  The victim and her sister returned to Michigan during the summers to spend time with defendant and his wife.

When the mother lost her job in Atlanta, defendant and his wife offered to rent her a room.  She accepted.  After the school year ended, she sent her daughters back to Michigan to live with defendant and his wife.  The victim was nine years old at the time.  The mother followed her daughters to Michigan at the end of the summer.  She, her two daughters, and their younger brother all shared a room in defendant's home.

The victim testified that defendant began to sexually abuse her when she was nine years old.  All the assaults were similar.  When the victim was alone on a

2

couch with defendant watching television, defendant would touch her buttocks and penetrate her vagina and anus with his finger. The victim testified that defendant's actions frightened her and that defendant would stop assaulting her when she got up and left the room. The victim also testified that defendant threatened that he would evict her family from the house if she told anyone about the assaults.

The assaults continued over a 15-month period, until the victim revealed them to a friend. The information made its way to the victim's mother, who called the police. Defendant was charged with and a jury convicted him of three counts of first-degree criminal sexual conduct (CSC-I).[1] The recommended minimum sentence range under the sentencing guidelines was 9 to 15 years' imprisonment. The prosecutor requested that the trial judge sentence defendant to a minimum sentence at the high end of the guidelines with a "very, very lengthy tail."[2]

The judge went further than requested. He imposed a minimum sentence for each conviction that exceeded the guidelines recommendation, explaining:

> This is the type of case that I think manifests the absolute worst type of exploitation. A child was placed in a position of trust

---

[1] MCL 750.520b(1)(a).

[2] Generally, the punishment for CSC-I is imprisonment for any term of years or life. MCL 750.520b(2). When the trial court chooses to sentence a defendant to a term of years, it must fix both the minimum and maximum terms of the sentence. MCL 769.9(2). Here, the prosecutor requested a minimum term within the statutory guidelines recommendation. The request for a "lengthy tail" was a request for a high maximum term.

3

and care with the defendant and his wife. This was at a time a 10 year old child had come from a clearly dysfunctional family, and this was an opportunity for [defendant] to provide a sense of refuge and a sense of stability clearly for [the victim].

There was no male figure in her life, and [defendant] had that opportunity to fill that role, which could have been not only a blessing for him but certainly a blessing for [the victim].

Those of us who have daughters certainly understand that fathers are in a very unique position with regard to their daughters and that we have the opportunity in many respects based on our relationship and the nature of the relationship that we have with our daughters to model or pattern the type of healthy or unhealthy relationship that young women then grow up to have with men in the future as adults.

And so what happened here? Here this 10 year old child looking for, and in fact starved for a positive adult male role model ends up being over a period of about 15 months a sex toy for the defendant. To what extent she will be damaged in the future, who knows? One certainly hopes that she will be able to do well.

But certainly this was a circumstance where [defendant] chose to exploit this relationship. And then in his testimony to blame the child, categorize her as a liar.

And through this particular ordeal forcing the victim, this 10 year old, to have to go through a rather, for her, for a 10 year old, the kind of frightening gynecological type of examination certainly adding to the trauma in this particular case, I think that certainly the Michigan Supreme Court in People versus Babcock has stated that if the Court is going to go outside the guidelines, the Court must in fact look to objective and verifiable facts and circumstances in evidence.

Certainly it is an objective and verifiable fact that the defendant stood in the role of a parental figure for a child who had none. That this was a child who was sexually exploited over a period of 15 months. That's verifiable.

These are the characteristics that I think don't adequately get covered in the guidelines. They don't. I mean it's unimaginable to me to think that a 10 year old who may be fearful of the fact that she

4

may lose the roof over her head for herself, her mother and her two siblings, is forced to silently endure this kind of sexual exploitation.

The guidelines didn't calculate that, but I am.

On a departure evaluation form, the judge summarized his reasons for the departure: (1) defendant's role as a child-care provider,[3] (2) the period over which the abuse occurred, (3) the defendant's threat to evict the victim and her family if she told anyone about his conduct, and (4) the gynecological examination the victim was forced to undergo. The judge sentenced defendant to three concurrent terms of 30 to 50 years' imprisonment, with credit for 23 days served. The minimum term of 30 years' imprisonment is twice the highest minimum term defendant could have received had the judge sentenced him within the guidelines recommendation.

The Court of Appeals affirmed defendant's convictions and sentences in an unpublished opinion per curiam.[4] It concluded that the reasons the judge gave for

---

[3] Because the judge referred to defendant's status as a child-care provider, defendant argues that the judge violated MCL 769.34(3)(a). That statute prohibits a judge from exceeding the guidelines because of a defendant's legal occupation. The record indicates that defendant was not legally working as a child-care provider during the period in question. His wife was primarily responsible for the baby-sitting services they advertised, and the home was not licensed to provide child-care. We infer from the judge's statements that he referred to the child-care position because defendant had exploited his position of trust as a child-care provider for the vulnerable victim. We conclude that the judge did not depart on the basis of defendant's occupation.

[4] *People v Smith*, unpublished opinion per curiam of the Court of Appeals, issued July 19, 2007 (Docket No. 267099).

departure were objective and verifiable.[5]   It further concluded that the judge did

not abuse his discretion in determining that his reasons were substantial and

compelling.[6]   Finally, the Court of Appeals held that the sentences were

proportionate to the seriousness of the crimes.[7]

Defendant applied for leave to appeal in this Court.  We ordered oral

argument on whether to grant the application or take other peremptory action.[8]

THE TRIAL COURT'S INITIAL BURDEN TO ARTICULATE SUBSTANTIAL AND
COMPELLING REASONS FOR DEPARTURE

Under MCL 769.34(3), a minimum sentence that departs from the

sentencing guidelines recommendation requires a substantial and compelling

reason articulated on the record.  In interpreting this statutory requirement, the

Court has concluded that the reasons relied on must be objective and verifiable.

They must be of considerable worth in determining the length of the sentence and

should keenly or irresistibly grab the court's attention.[9]   Substantial and

compelling reasons for departure exist only in exceptional cases.[10]   "In

determining whether a sufficient basis exists to justify a departure, the principle of

proportionality . . . defines the standard against which the allegedly substantial and

---

[5] *Id*. at 5-6.

[6] *Id*. at 6.

[7] *Id*.

[8] 480 Mich 1014 (2008).

[9] *People v Babcock*, 469 Mich 247, 257-258; 666 NW2d 231 (2003).

[10] *Id*.

6

compelling reasons in support of departure are to be assessed."[11] For a departure to be justified, the minimum sentence imposed must be proportionate to the defendant's conduct and prior criminal history.[12]

The trial court may not base a departure "on an offense characteristic or offender characteristic already taken into account in determining the appropriate sentence range unless the court finds from the facts contained in the court record, including the presentence investigation report, that the characteristic has been given inadequate or disproportionate weight."[13]

On appeal, courts review the reasons given for a departure for clear error.[14] The conclusion that a reason is objective and verifiable is reviewed as a matter of law.[15] Whether the reasons given are substantial and compelling enough to justify the departure is reviewed for an abuse of discretion, as is the amount of the departure.[16] A trial court abuses its discretion if the minimum sentence imposed falls outside the range of principled outcomes."[17]

---

[11] *Id.* at 262.

[12] *Id*. at 262-264.

[13] MCL 769.34(3)(b).

[14] *Babcock*, 469 Mich at 264.

[15] *Id.*

[16] *Id*. at 264-265.

[17] *Id*. at 269.

Under MCL 769.34(7), the court must advise a defendant that he or she may seek appellate review of a sentence that is more severe than the guidelines recommendation. There is no preservation requirement for review of such a sentence.[18]

In this case, the trial judge articulated the reasons for his departure. In particular, he referred to the 15-month period over which the serial abuse occurred. The fact that defendant abused the victim for more than a year was not reflected in the guidelines.

That sexual abuse occurred over a long period is an objective and verifiable reason for departure. The abuse in this case was not something that was completed quickly. For more than a year, the victim undoubtedly suffered psychological stress from the realization that defendant might abuse her again and again. This fact is of considerable worth in determining defendant's minimum sentence. Also, it is a fact that does not exist in all criminal sexual conduct cases. Hence, the trial judge did not abuse his discretion in concluding that the long period of abuse provided a substantial and compelling reason for departure.

The judge also relied on the fact that defendant threatened to retaliate by evicting the victim and her family if she disclosed to anyone his predatory sexual behavior. This is objective and verifiable because the threat was external to the minds of those involved and could be confirmed on the record. The judge did not

---

[18] MCL 769.34(7); MCR 2.517(A)(7).

abuse his discretion in concluding that this fact provided a substantial and compelling reason to depart. It was not considered in the guidelines, and making such a threat to a child could cause significant psychological anguish. It forced the child to choose between reporting the defendant's repeated criminal assaults and protecting her family from homelessness. The threat was distinct enough to actively and strongly draw the judge's attention.

The judge additionally relied on the gynecological examination the victim underwent as a result of defendant's sexual abuse. Defendant contends that such examinations are to be expected when sexual abuse has been alleged and cannot constitute a substantial and compelling basis for departure. Defendant is correct that commonplace repercussions of criminal activity do not support departures, which may be made only in exceptional cases.[19] This is because the sentencing guidelines are designed to promote uniformity in criminal sentencing by "'ensur[ing] that offenders with similar offense and offender characteristics receive substantially similar sentences.'"[20] Hence, we agree that this repercussion of criminal sexual conduct would not generally represent such a wide deviation from the norm that a departure could be premised on it.

---

[19] *Babcock*, 469 Mich at 257-258.

[20] *Id.* at 267 n 21, quoting former MCL 769.33(1)(e)(*iv*), which specified some of the duties at the former Sentencing Commission in connection with the sentencing guidelines as added by 1994 PA 445.

However, under the unique circumstances of this case, the trial judge's conclusion that the gynecological examination provided a substantial and compelling reason for departure was not an abuse of discretion. The evidence indicates that the examination added considerably to the victim's trauma. This trauma was demonstrated by the victim's testimony that the examination was uncomfortable and embarrassing. More significantly, it was demonstrated by her behavior during the examination. Under these circumstances, the judge did not abuse his discretion in concluding that this repercussion of defendant's behavior was of considerable worth in determining the length of defendant's minimum sentence.[21]

---

[21] The judge also referred to defendant's exploitation of the victim's vulnerability as a basis for departure. However, this exploitation was, at least partially, already accounted for in the guidelines under offense variable 10 (OV 10). MCL 777.40. An offense characteristic taken into account in determining the sentencing range may not be a basis for departure unless the judge finds that the characteristic was given inadequate or disproportionate weight. MCL 769.34(3)(b).

The judge's failure to address OV 10 leaves us unable to ascertain whether he believed the factor was given inadequate weight or whether he failed to recognize that the guidelines consider exploitation. We cannot discern whether the judge would have departed to the same degree had he referenced the offense variables, particularly OV 10, that arguably addressed some of the reasons cited for departure. This failure to address those variables is an additional basis for our remand for resentencing. See *Babcock*, 469 Mich at 260-261.

In her dissent, Justice Corrigan argues that this Court should infer that the judge considered the assessment of points for OV 10 and found the assessment inadequate. We disagree. The judge's statement that the "guidelines didn't calculate that," referring in part to exploitation, implies that he failed to recognize that points are assessed under the guidelines for exploitation of victim

(continued…)

By citing these facts that justified departure in this case, the trial judge met the initial burden of articulation.

PROPORTIONALITY

Having concluded that the trial judge cited substantial and compelling reasons to justify a departure, we turn to the question whether the reasons also justified the particular departure: a minimum sentence that is 15 years more than the top of the guidelines range. "The obligation is on the trial court to articulate a substantial and compelling reason for any departure."[22] However, the statutory guidelines require more than an articulation of reasons for *a* departure; they require justification for the *particular* departure made.

MCL 769.34(3) states:

> A court may depart from the appropriate sentence range established under the sentencing guidelines set forth in chapter XVII if the court has a substantial and compelling reason for *that* departure and states on the record the reasons for departure. [Emphasis added.]

---

(…continued)

vulnerability. Given this statement and the lack of any specific reference to OV 10, we will not infer that the judge concluded that OV 10 inadequately considered the factor of exploitation. Our conclusion is not the equivalent of requiring "magic words" for departure, as Justice Corrigan suggests. *Post* at 8. We are simply refusing to infer that the judge meant one thing when he suggested the opposite.

[22] *Babcock*, 469 Mich at 259.

We have stressed that this statutory language requires the trial court to "justify the *particular* departure in a case, i.e., 'that departure.'"[23]

Appellate courts are obliged to review the trial court's determination that a substantial and compelling reason exists for departure.[24] Accordingly, the trial court's justification "must be sufficient to allow for effective appellate review."[25] In *Babcock*, this Court explained that an appellate court cannot conclude that a particular substantial and compelling reason for departure existed when the trial court failed to articulate that reason.[26] Similarly, if it is unclear why the trial court made a particular departure, an appellate court cannot substitute its own judgment about why the departure was justified. A sentence cannot be upheld when the connection between the reasons given for departure and the extent of the departure is unclear. When departing, the trial court must explain why the sentence imposed is more proportionate than a sentence within the guidelines recommendation would have been.

The "principle of proportionality . . . defines the standard against which the allegedly substantial and compelling reasons in support of departure are to be

---

[23] *People v Hegwood*, 465 Mich 432, 437 n 10; 636 NW2d 127 (2001) (emphasis in original).

[24] *Babcock*, 469 Mich at 259.

[25] *Id*. at 259 n 13.

[26] *Id*. at 258-259.

assessed."[27] Hence, to complete our analysis of whether the trial judge in this case articulated substantial and compelling reasons for the departure, we must, of necessity, engage in a proportionality review. Such a review considers "whether the sentence is proportionate to the seriousness of the defendant's conduct and to the defendant in light of his criminal record . . . ."[28] "[E]verything else being equal, the more egregious the offense, and the more recidivist the criminal, the greater the punishment."[29]

As we noted in *Babcock*, the very purpose of the sentencing guidelines is to facilitate proportionate sentences. We stated:

> Under the guidelines, offense and prior record variables are scored to determine the appropriate sentence range. Offense variables take into account the severity of the criminal offense, while prior record variables take into account the offender's criminal history. Therefore, the appropriate sentence range is determined by reference to the principle of proportionality; it is a function of the seriousness of the crime and of the defendant's criminal history.[30]

A sentencing departure is appropriate when "there are substantial and compelling reasons that lead the trial court to believe that a sentence within the guidelines range is not proportionate to the seriousness of the defendant's conduct and to the seriousness of his criminal history . . . ."[31] The departure from the guidelines

---

[27] *Id*. at 262.

[28] *Id*.

[29] *Id*. at 263.

[30] *Id*. at 263-264.

[31] *Id.* at 264.

13

recommendation must "contribute to a more proportionate criminal sentence than is available within the guidelines range."[32]

Here the trial judge gave no explanation for the *extent* of the departure independent of the reasons given to impose a departure sentence. Therefore, no justification was offered to support the large departure made.

One potential means of offering such a justification is to place the specific facts of a defendant's crimes in the sentencing grid. When that is done in this case, the result suggests that the sentence imposed was disproportionate. Defendant's crimes are classified as class A felonies.[33] The minimum sentence ranges for class A offenses (in months) are contained in the following grid:[34]

**Prior Record Variable Level**
**(Total PRV Points)**

---

[32] *Id.*

[33] MCL 777.16(y).

[34] MCL 777.62

14

| Offense Variable Level (Total OV Points) | A 0 points | B 1-9 points | C 10-24 points | D 25-49 points | E 50-74 points | F 75+ points |
|---|---|---|---|---|---|---|
| I 0-19 points | 21-35 | 27-45 | 42-70 | 51-85 | 81-135 | 108-180 |
| II 20-39 points | 27-45 | 42-70 | 51-85 | 81-135 | 108-180 | 126-210 |
| III 40-59 points | 42-70 | 51-85 | 81-135 | 108-180 | 126-210 | 135-225 |
| IV 60-79 points | 51-85 | 81-135 | 108-180 | 126-210 | 135-225 | 171-285 |
| V 80-99 points | 81-135 | 108-180 | 126-210 | 135-225 | 171-285 | 225-375 or life |
| VI 100+ points | 108-180 | 126-210 | 135-225 | 171-285 | 225-375 or life | 270-450 or life |

The prior record variable (PRV) level is determined by the total points assessed for the prior record variables scored. The offense variable (OV) level is determined by the total points assessed for the offense variables scored.

Defendant had a total PRV score of 20 points, which corresponds to a PRV level C.[35] The trial judge assessed 10 points for OV 10 (exploitation of a vulnerable victim) and 50 points for OV 11 (criminal sexual penetration), resulting

---

[35] The judge assessed 20 points for PRV 7 (subsequent and concurrent felonies) because, as a result of this case, defendant had two concurrent felony convictions. MCL 777.57(1)(a).

in a total OV score of 60 points.[36] This corresponds to an OV level IV. Defendant's recommended minimum sentence range of 108 to 180 months is found by locating the intersection of PRV level C and OV level IV on the sentencing grid for class A felonies.[37]

The trial judge sentenced defendant as if his OV and PRV scores corresponded to the E-VI, F-V, or F-VI cell of the grid.[38] These cells provide the highest possible minimum sentences for class A felonies. For defendant's sentence to fall within the guidelines recommendation for the E-VI, F-V, or F-VI cell, the judge would have had to assess 20 to 40 additional OV points and 30 to 45 additional PRV points. On this record, it is hard to understand what factors would justify the extent of the departure made. That difficulty is compounded by the fact that the trial judge offered no justification why this departure was a proportionate one.

It is compelling to compare defendant's departure sentence, 30 to 50 years (360 to 720 months), with the recommended minimum sentences on the applicable sentencing grid. Given defendant's PRV level of C, his recommended minimum sentence could not have been 360 months. The highest recommended minimum

---

[36] It appears that the judge erroneously assessed 50 points for OV 11. However, defendant admits that 50 points should have been assessed for OV 13 (continuing pattern of criminal behavior). Thus, a correction would not affect defendant's OV score.

[37] MCL 777.21(1)(c); MCL 777.62.

[38] See MCL 777.62.

sentence on the grid for that PRV level is 225 months.[39] Accordingly, simply comparing defendant's actual minimum sentences to the recommended minimum sentences for offenders with similar criminal histories suggests that defendant's sentences might be disproportionate.

Moreover, the substantial and compelling reasons on which the judge based his departure were related to the nature of the offense, not to the extent of defendant's criminal history. Put otherwise, the departure reasons pertained to defendant's OV score, not his PRV score. With regard to the OV score, it is theoretically possible for a defendant to receive a total of 590 points for a crime against a person, such as CSC-I.[40] If a defendant has a low PRV score but an OV score over 100, the court may render a proportionate sentence above the highest

---

[39] *Id.*

[40] MCL 777.22(1) requires the court to score the following offense variables for all crimes against a person (maximum scores are in parentheses): OV 1 (aggravated use of a weapon) (25 points), MCL 777.31(1)(a); OV 2 (lethal potential of weapon) (15 points), MCL 777.32(1)(b); OV 3 (physical injury to victim) (100 points), MCL 777.33(1)(a); OV 4 (psychological injury to victim) (10 points), MCL 777.34(1)(a); OV 7 (aggravated physical abuse) (50 points), MCL 777.37(1)(a); OV 8 (asportation of victim) (15 points), MCL 777.38(1)(a); OV 9 (number of victims) (100 points), MCL 777.39(1)(a); OV 10 (15 points), MCL 777.40(1)(a); OV 11 (50 points), MCL 777.41(1)(a); OV 12 (contemporaneous felonious acts) (25 points), MCL 777.42(1)(a); OV 13 (50 points), MCL 777.43(1)(a); OV 14 (offender's role) (10 points), MCL 777.44(1)(a); OV 19 (security threats or interference with justice) (25 points), MCL 777.49(1)(a); and OV 20 (terrorism) (100 points), MCL 777.49a(1)(a). Obviously, many of these variables could not be scored in this case or in most criminal sexual conduct cases. I list them to demonstrate that more than 100 points are possible under PRV level C.

17

minimum for someone with a similar PRV score. This is because the Legislature did not contemplate a defendant with such a high OV score, given that it used 100 OV points as the maximum for the grid.

However, that is not the case here, because defendant's OV score is within the lower OV levels on the grid. Thus, the trial judge must explain why the reasons for the departure that he articulated warranted a drastic departure from the highest minimum available for a defendant with a similar PRV score. The burden will be heavy, because the sentence imposed is literally off the charts for a defendant with a criminal background similar to that of this defendant.

A comparison of defendant's sentences to the sentences recommended for other offenders who committed the same type of crime suggests that defendant's sentences might be disproportionate. Although the atrocity of any criminal sexual conduct offense is not to be minimized, proportionality is still judged by weighing both the nature of the offense and the offender's criminal history. Given the fact that defendant had no criminal history, the 30-year minimum sentence imposed for each conviction might be a disproportionate departure.

Certainly, a trial court that is contemplating a departure is not *required* to consider where a defendant's sentence falls in the sentencing range grid. However, we think that reference to the grid can be helpful, because it provides objective factual guideposts that can assist sentencing courts in ensuring that the

18

"'offenders with similar offense and offender characteristics receive substantially similar sentences.'"[41]

Appellate review is also aided when a court explains the similarity between the facts justifying the departure and the facts describing a crime meriting the same sentence under the guidelines. Also, a comparison of a defendant's characteristics and those of a hypothetical defendant whose recommended sentence is comparable to the departure sentence is a valuable exercise. This, too, will aid an appellate court in reviewing the proportionality of the departure.

The trial court should note which variables it is considering in such a comparison. It should explain why its reasons for departure are as significant as the characteristics that would produce an equally lengthy recommended minimum sentence under the guidelines.

Turning to the facts in the instant case, it is obvious that CSC-I involving a nine-year-old child is a heinous crime. It damages children, families, and friendships. But all CSC-I cases do not wreak the same amount of damage. That the sexual abuse in this case occurred over a 15-month period is extraordinarily

---

[41] *Babcock,* 469 Mich at 267 n 21, quoting former MCL 769.33(1)(e)(*iv*), as added by 1994 PA 445. The statutory sentencing guidelines are based on statewide sentencing data. They reflect the Legislature's judgment about how the variables of mitigation and aggravation should be applied to reach a proportionate sentence. Accordingly, the sentencing grids provide an objective source of data on sentencing. The statutory guidelines, and the judicial guidelines that preceded them, were designed to avoid individual and regional variation in sentencing. Hence, using the grid as a reference point to assess and anchor a departure is an exercise well-designed to promote uniformity.

disturbing, as the trial judge recognized. That defendant threatened to evict the victim and her family if she reported the crime is also of considerable importance in determining defendant's sentence. That the victim underwent a traumatic gynecological examination is also of consequence.

The trial judge articulated some appropriate reasons for departure, but failed to explain why those reasons justify the extent of the departure. Furthermore, it is not readily apparent why such a substantial departure is warranted on the basis of those reasons. While defendant's crime is most certainly heinous, we cannot discern why the trial judge selected a minimum sentence so far in excess of the recommended guidelines range.[42] We cannot uphold such an unsupported departure.

As noted earlier, the sentencing guidelines were designed to promote uniformity in sentencing. One of the purposes of the proportionality requirement is to minimize idiosyncrasies. We do not suggest that trial courts must sentence defendants with mathematical certainty.[43] Nor are any precise words necessary for them to justify a particular departure.[44]

---

[42] A departure cannot be justified on the sole basis that a crime is heinous. All criminal-sexual-conduct cases involving young children are heinous. Certainly the Legislature did not overlook this basic fact when establishing sentencing guidelines for these crimes.

[43] *Babcock*, 469 Mich at 260 n 14.

[44] *Id*. at 259 n 13.

Ultimately, in reviewing sentences, appellate courts examine the reasons articulated for departure. The trial court's articulation must be sufficiently detailed to facilitate appellate review. This includes an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been. Here the trial judge failed to offer any valid explanation justifying why he chose to sentence defendant to minimum terms of imprisonment of 30 years. As such, we must vacate defendant's sentences and remand the case to the trial judge so that he may articulate why this level of departure is warranted or resentence defendant.

RESPONSE TO JUSTICE CORRIGAN'S DISSENT

Contrary to Justice Corrigan's assertion, our approach is completely consistent with *Babcock* and the language of MCL 769.34. We emphasize in this opinion a point that was made in *Babcock*. It is that, under MCL 769.34(3), "the trial court must articulate on the record a substantial and compelling reason to justify the particular departure imposed."[45] Although Justice Corrigan argues that neither *Babcock* nor MCL 769.34 requires that this case be remanded, she fails to identify where in the record the trial judge justified the *particular* departure he made. She cannot identify it because the trial judge failed to provide it. We cannot uphold a departure when the connection between the reasons given for departure and the extent of the departure is so unclear. To do so would be akin to

[45] *Id*. at 260.

21

immunizing sentencing decisions from review for proportionality. Moreover, it would undermine the Legislature's goal in enacting the sentencing guidelines.

The Legislature adopted the guidelines to promote uniform sentencing across the state.[46] The general rule is that minimum sentences must be within the recommended guidelines range.[47] A defendant is entitled to be sentenced within that range unless the judge provides a substantial and compelling reason why a departure sentence is more proportionate to the offense and the offender. The judge must explain why a sentence outside the range better promotes uniform sentencing, in accordance with the purpose of the guidelines.

Justice Corrigan contends that it is sufficient to further the legislative goal of sentencing uniformity to require judges to articulate substantial and compelling reasons for their departures. She argues that this requirement ensures that departures are difficult enough to justify that the exception does not swallow the rule. She further asserts that, as long as the record supports *a* departure, *any* departure sentence should be upheld on appeal as long as it is reasonable. She

---

[46] See former MCL 769.33(1)(e)(*iv*), as added by 1994 PA 445. This provision was the part of the Code of Criminal Procedure that created the Sentencing Commission. The Legislature repealed the provisions in the code pertaining to the commission, including MCL 769.33(1)(e)(*iv*), after it enacted the sentencing guidelines. See 2002 PA 31. But the fact that it repealed the provision as part of the elimination of the Sentencing Commission does not mean that the Legislature abandoned its goal of uniformity in sentencing. Rather, it represents the fact that the Legislature concluded that the Sentencing Commission had done all that it could to further that goal.

[47] MCL 769.34(2).

rejects this Court's holding in *Babcock* when she opines that a judge should not be required to justify the particular departure sentence imposed.

Justice Corrigan relies on MCL 769.34(11), which states:

> If, upon a review of the record, the court of appeals finds the trial court did not have a substantial and compelling reason for departing from the appropriate sentence range, the court shall remand the matter to the sentencing judge or another trial court judge for resentencing under this chapter.

Justice Corrigan misconstrues this provision by failing to read it in the context of the rest of the statute.

In MCL 769.34(3), the Legislature put the burden on the trial court to place on the record one or more substantial and compelling reasons for a particular departure.[48]  Hence, it is the trial court that must justify *on the record* both the departure and the extent of the departure.[49]  This is not to say that appellate courts need examine only the sentencing transcript to determine if the court abused its discretion in imposing a sentence.  Under MCL 769.34(11), appellate courts review the record to ascertain if the court articulated adequate reasons for the departure and to justify the extent of the departure.  If, after reviewing the whole

---

[48] See MCL 769.34(3); *Babcock*, 469 Mich at 259-260.

[49] Justice Corrigan is mistaken when she opines that, by requiring courts to justify the particular departure, we read into the statute something that is not there. The Legislature has required the trial court to state a substantial and compelling reason justifying the departure.  MCL 769.34(3).  Our opinion today merely provides guidance to trial courts on how they may formulate and articulate that justification.  It is, in fact, our duty to give guidance to the bench and bar in such matters.

record, the connection between the reasons given for departure and the extent of the departure is unclear, then the sentence cannot be upheld.[50]

Moreover, simply requiring a court to articulate substantial and compelling reasons for a departure would not promote uniformity. Trial courts would not be constrained to impose only those sentences that they can justify. Under the rule advocated by Justice Corrigan, defendants with similar offense and offender characteristics could receive widely divergent departure sentences. Justice Corrigan would not subject sentences based on a departure to full appellate review. Any arguably reasonable sentence would be upheld, even if it were not proportionate to the offense and the offender. A lack of meaningful review would inevitably encourage idiosyncratic sentencing. Such a result is contrary to the Legislature's express intent.[51]

---

[50] However, appellate courts may not review the record to search for reasons to uphold a sentence that the trial court failed to justify. *Babcock*, 469 Mich at 258-259.

[51] See former MCL 769.33(1)(e)(*iv*), as added by 1994 PA 445. Justice Corrigan's conclusion that the Legislature desired that a less stringent standard of uniformity pertain to departure sentences, *post* at 10, is incorrect. The Legislature permitted departures with the understanding that the guidelines could not account for all conceivable scenarios. However, that fact does not alter the overarching goal of uniformity in all sentencing. Rather, it constitutes the Legislature's recognition that uniformity can be advanced only if departures from the guidelines are limited to cases involving unusual circumstances.

With respect to departures, we must determine whether the trial court abused its discretion in imposing the sentence by weighing whether the reasons given justify the departure. We ask whether the court imposed a sentence that is not proportionate to the offense and the offender and thereby abused its discretion.

(continued…)

The requirement that the trial court justify the extent of the departure is not overly burdensome. The court need only reasonably comply with the statutory articulation requirement in order to facilitate appellate review. Justice Corrigan expends a great deal of energy attempting to rebut an argument that we do not make: that a trial court must provide a mathematical justification for its departure.

Our observation that grounding a departure in the sentencing guidelines will help to explain the extent of the departure does not mean that departure can be reduced to a mathematical equation. To the contrary, mathematical precision in sentencing is neither required nor possible. Nonetheless, the difference between the sentence imposed based on a departure and the recommended minimum sentence range under the guidelines is relevant to the proportionality analysis. When Justice Corrigan advocates upholding defendant's sentences even though the judge failed to justify this difference, she disregards *Babcock*.

Justice Corrigan relies heavily on the United States Supreme Court decision in *Gall v United States*.[52] There the Court addressed whether an appellate court reviewing a substantial variance from the federal sentencing guidelines could

---

(…continued)
We would be derelict in our duty to advance the Legislature's goal of uniform sentencing if we imposed a less stringent standard of review on sentences that are based on a departure.

[52] *Gall v United States*, 552 US___; 128 S Ct 586; 169 L Ed 2d 445 (2007).

require that the departure be justified by "extraordinary circumstances."[53]  The *Gall* Court held that an appellate court could consider the degree of deviation from the federal sentencing guidelines when reviewing a departure.[54]  However, it rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range."[55]  The *Gall* Court also rejected "the use of a rigid mathematical formula" in gauging the justifications for the departure.[56]

Much of the *Gall* Court's analysis is inapplicable to Michigan's indeterminate sentencing guidelines.  The federal sentencing guidelines are not mandatory.[57]  By contrast, a sentence in Michigan must be within the guidelines recommendation unless the court states on the record one or more substantial and compelling reasons to depart from it.[58]  Substantial and compelling reasons for departure exist only in exceptional cases.[59]  And when a trial court renders a departure sentence, Michigan appellate courts *must* review whether the court abused its discretion in concluding that extraordinary circumstances justified it.

---

[53] *Id*. at ___; 128 S Ct at 591.

[54] *Id*. at ___; 128 S Ct at 594-595.

[55] *Id*. at ___; 128 S Ct at 595.

[56] *Id*. at ___; 128 S Ct at 595.

[57] *Id*. at ___; 128 S Ct at 594.

[58] *People v Buehler*, 477 Mich 18, 24; 727 NW2d 127 (2007).

[59] *Babcock*, 469 Mich at 257-258.

To the extent that Justice Corrigan relies on *Gall* to reject the use of a rigid mathematical formula, her reliance is misplaced. As previously indicated, we do not adopt a rigid mathematical formula. Instead, consistently with *Gall*, we stress that the difference between a departure sentence and one within the recommended guidelines range is relevant to the proportionality analysis.[60] Accordingly, it is appropriate for courts to articulate the required justification for departure by anchoring that justification in the sentencing guidelines.

Justice Corrigan buoys her position with facts that are not relevant. For instance, it is true that the trial judge in this case could have imposed a life sentence. But this fact does not bear on whether he justified the sentence he actually imposed. Similarly, Justice Corrigan spends considerable time discussing the behavior of defendant's wife during the trial. But even if the wife's behavior could be attributed to defendant, the judge did not cite it as a basis for departure. Accordingly, it cannot support the departure made.[61]

Justice Corrigan suggests that our analysis resembles de novo review.[62] Her assertion is unexplained and misguided. We continue to review for an abuse of discretion. We weigh whether the reasons that the trial court gave are substantial and compelling enough to justify the departure sentence imposed. In

---

[60] *Gall*, 552 US at ___; 128 S Ct at 591.

[61] *Babcock*, 469 Mich at 258-259.

[62] *Post* at 6 n 4.

27

this case, the judge abused his discretion because he imposed a departure sentence without adequately justifying the extent of the departure. Therefore, the sentence falls outside the range of principled outcomes.

The analysis set forth in this opinion is consistent with MCL 769.34 and with the caselaw interpreting that statute. Moreover, it is not overly burdensome, and it advances the Legislature's goal of sentencing uniformity. The same cannot be said for Justice Corrigan's analysis.

## SUMMARY

In order to assist trial courts in fulfilling their statutory obligations, we offer the following summary:

(1) The trial court bears the burden of articulating the rationale for the departure it made. A reviewing court may not substitute its own reasons for departure. Nor may it speculate about conceivable reasons for departure that the trial court did not articulate or that cannot reasonably be inferred from what the trial court articulated.

(2) The trial court must articulate one or more substantial and compelling reasons that justify the departure it made and not simply *any* departure it might have made.

(3) The trial court's articulation of reasons for the departure must be sufficient to allow adequate appellate review.

(4) The minimum sentence imposed must be proportionate. That is, the sentence must adequately account for the gravity of the offense and any relevant characteristics of the offender. To be proportionate, a minimum sentence that exceeds the guidelines recommendation must be more appropriate to the offense and the offender than a sentence within the guidelines range would have been.

(5) When fashioning a proportionate minimum sentence that exceeds the guidelines recommendation, a trial court must justify why it chose the particular degree of departure. The court must explain why the substantial and compelling reason or reasons articulated justify the minimum sentence imposed.

(6) It is appropriate to justify the proportionality of a departure by comparing it against the sentencing grid and anchoring it in the sentencing guidelines. The trial court should explain why the substantial and compelling reasons supporting the departure are similar to conduct that would produce a guidelines-range sentence of the same length as the departure sentence.

(7) Departures from the guidelines recommendation cannot be assessed with mathematical precision. The trial court must comply *reasonably* with its obligations under the guidelines, as set forth in this opinion, to further the legislative goal of sentencing uniformity.

### CONCLUSION

Some of the reasons that the trial judge articulated as the basis for the departure are legitimate. However, those reasons fail to justify the severity of the

29

minimum sentences that he imposed. From our review of the record and of the judge's reasons for departure, it is unclear why a minimum sentence of 30 years' imprisonment is warranted for this defendant.

We vacate defendant's sentences and remand this case to the trial judge for resentencing and for an explanation of the extent of any departure made on remand. We deny leave to appeal in all other respects.

> Marilyn Kelly
> Clifford W. Taylor
> Michael F. Cavanagh
> Robert P. Young, Jr.
> Stephen J. Markman

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v                                    No. 134682

GARY THOMAS SMITH,

     Defendant-Appellant.

_____

MARKMAN, J. (*concurring*).

I concur fully with the majority opinion. I write separately to respond briefly to Justice Corrigan's dissent and to emphasize one point that I believe is implicit in the majority opinion, but ought to be made explicit.

First, what separates the dissenting justices from the majority justices is not the former's conviction that defendant's 30-year minimum sentences "fall within the range of reasonable opinions regarding what sentences are appropriate in this case." *Post* at 32. Rather, it is the latter's conviction that the Legislature's purposes in enacting the sentencing guidelines-- in particular the attainment of reasonably uniform and proportionate criminal sentences-- can only be achieved if the guidelines are understood to mean what they say. Justice Corrigan fails to take sufficient account of the dispositive language in the present controversy:

> A court may depart from the appropriate sentence range established under the sentencing guidelines set forth in chapter XVII if the *court* has a substantial and compelling reason for *that* departure and states on the record the reasons for departure. [MCL 769.34(3) (emphasis added).][1]

Thus, we can derive the following from this statute: (1) it is the *sentencing* court that must "state[] on the record the [substantial and compelling] reasons for departure," not the appellate court, and (2) the sentencing court must articulate its reasons in support of "that" departure, not "some" departure, not "any" departure, and not "a" departure.[2]

These requirements are an obvious function of the overall purpose of the guidelines, which is to diminish the sentencing discretion of individual judges, and to temper aberrational or idiosyncratic sentencing decisions by substituting legal rules. The guidelines are intended to eliminate widely disparate sentences in

---

[1] Justice Corrigan criticizes the majority for relying on a "single word"-- "that"-- in MCL 769.34(3). *Post* at 26. However, this Court "interpret[s] *every* word, phrase, and clause in a statute to avoid rendering any portion of the statute nugatory or surplusage," *Herald Co v Eastern Michigan Univ Bd of Regents*, 475 Mich 463, 470; 719 NW2d 19 (2006) (emphasis added). To recall merely one previous decision in accord with this rule, we have placed great weight on whether "a" or "the" was employed in a statute. See *Robinson v Detroit*, 462 Mich 439, 461-462; 613 NW2d 307 (2000).

[2] Justice Corrigan would essentially compress what is in reality a two-part burden on the sentencing court into a single burden, by requiring the court to ask simply if "substantial and compelling" reasons exist for a departure. If so, then no further explanation would be required concerning the *extent* of a departure. She reaches this conclusion by removing from context MCL 769.34(11), which addresses appellate review generally, instead of harmonizing that provision with MCL 769.34(3), which sets forth a sentencing court's specific burdens under the sentencing guidelines.

which punishments may be more closely related to the predispositions of individual judges than to the predispositions of the people, as reflected through their representatives. Uniformity and proportionality of criminal sentences simply cannot be attained if departure sentences are largely exempted from legal rules under the guidelines, and MCL 769.34(3), in fact, establishes these rules: (a) the requirement that the sentencing court articulate reasons why a guidelines-range sentence is inadequate, and (b) the articulation of reasons in support of a specific departure sentence.[3] Notwithstanding, for example, that each lies outside a guidelines range of 9 to 15 years, there is a considerable difference between a 16-year and a 30-year minimum sentence, and the sentencing court must sufficiently justify these different decisions. This is not, as Justice Corrigan suggests, because of any "unreasonably burdensome" requirements imposed by this Court, *post* at 31, but because the Legislature has required this. The question in reviewing criminal sentences is not whether a sentence is "reasonable," *post* at 32, but whether it is *lawful*, i.e., in compliance with both the substance and the procedure of the guidelines.

---

[3] Although Justice Corrigan asserts that the majority "enacts a new, corollary sentencing regime by extending the sentencing guidelines to apply to departure sentences," *post* at 1-2, all that the majority asserts in reality is that departure sentences are no more exempt from the restraint of legal rules than non-departure sentences. The articulation of a "substantial and compelling" reason for departing from the guidelines does not constitute an all-purpose warrant for a departure of *any* magnitude.

Were Justice Corrigan's position to prevail, the reforms achieved by the sentencing guidelines would be significantly undermined. The goal of reasonably uniform punishments, in which similarly situated offenders are accorded reasonably similar punishments, would be significantly diluted. Defendant here, like every other criminal defendant, is entitled to be sentenced within the minimum-sentence range recommended under the legislatively mandated guidelines range, which, for defendant, has as its maximum 15 years' imprisonment. That is because this is the law. It can be assumed that each and every criminal sexual exploitation of a child is "heinous" and "atrocious," and yet this remains the punishment the people of Michigan have seen fit to establish in their law. When, however, there is a basis for an upward departure from the guidelines because there are factors that have not been taken into consideration, that departure is permissible, but it too must be done in accordance with the law. The sentencing judge may depart from the guidelines range, but he must articulate the basis for doing so, and he must explain why an alternative sentence *better* comports with the aims of the law, in particular the law's pursuit of proportionate and uniform criminal sentences.

Justice Corrigan would essentially exempt from these standards that part of a potential criminal sentence lying outside the guidelines range, which in the present case would exempt nearly 90 percent of defendant's potential sentence

4

from even rudimentary appellate review.[4] Defendants sentenced within the guidelines range would be subject to the standards of proportionality and uniformity, while defendants sentenced outside this range would be restored to a pre-guidelines environment in which individual judges could impose widely disparate sentences without meaningful appellate review. Once grounds have been articulated for proceeding outside the guidelines range (in this case, a minimum sentence of 9 to 15 years), it would be of little moment whether the sentencing judge imposed a 16-year or a 30-year sentence following an upward departure, or an 8-year or a 2-year sentence following a downward departure, for the dissenting justices see little need to justify the *actual* sentence given to a defendant.[5]

---

[4] Reflecting a theme running throughout her opinion, Justice Corrigan asserts that the majority opinion will result in "incomplete scrutiny" of departure sentences. *Post* at 6 n 4; see also note 6 of this opinion. However, in pursuing the goals of uniformity and proportionality among departure sentences, it is hardly compelling to argue that this is better not done at all than through imperfect means.

[5] Justice Corrigan asserts that departure sentences are "not governed by the general rule of uniformity" that applies to guidelines-range sentences, because "[d]eparture sentences generally involve less quantifiable facts . . . ." *Post* at 10. However, "quantifiability" is not the distinguishing characteristic between guidelines-range sentences and departure sentences. That is, a departure sentence may be based on nothing more than the fact that the guidelines do not fully account for the sheer *number* of victims harmed by the defendant, a readily "quantifiable" number. Moreover, departure sentences must be based upon "objective and verifiable" factors, *People v Babcock*, 469 Mich 247, 257-258; 666 NW2d 231 (2003), hardly a synonym for "non-quantifiable." There are not two tiers of criminal sentences in Michigan, one in which uniformity and proportionality are sought, and another in which they are not.

The sentencing guidelines were designed to restrain judicial sentencing discretion, so that punishments would effectively be determined by the people through their representatives, rather than by the serendipity of whether Lenient Larry or Maximum Mike happened to be the sentencing judge.  The direction of the dissents is toward the restoration of a system in which citizen judgments concerning appropriate criminal punishments would be supplanted by the decision-making of individual judges.  In place of what has proven to be a successful reform of the criminal-justice system, and the attainment of a heightened rule of law, the dissenting justices, by eroding the sentencing guidelines, would restore a heightened rule of judges.

Second, I would emphasize that the majority does not assert that analogizing to the sentencing grid constitutes the *exclusive* means by which a court may seek to justify a particular departure; rather, it holds that *some* means is necessary to "justify why [the sentencing court] chose the particular degree of departure," *ante* at 29, and that using the sentencing grid constitutes one "potential means of offering such a justification." *Ante* at 14.  I agree with this.

However, one additional logical method by which to justify a particular departure, perhaps not worth belaboring because of its obviousness, is for the court simply to *compare* a sentence to others imposed in reasonably similar cases. This method derives from the basic principle underlying our sentencing system: securing a proportionate criminal sentence.  A proportionate sentence is one that

adequately reflects "'the seriousness of the defendant's conduct and . . . the seriousness of his criminal history.'" *Ante* at 13-14, quoting *People v Babcock*, 469 Mich 247, 264; 666 NW2d 231 (2003). Assessing the seriousness of a defendant's conduct and his criminal history necessarily entails that a sentencing court will engage in some comparison between criminal offenses. That is, the seriousness of a defendant's conduct and a defendant's criminal history is not measured in a vacuum; rather, in answering the question of how "serious" a crime is, the court is essentially asking itself whether that crime is of greater or lesser gravity than other criminal offenses and "determining where, on the continuum from the least to the most serious situations, an individual case falls . . . ." *People v Milbourn*, 435 Mich 630, 654; 461 NW2d 1 (1990). Thus, a comparison of a departure in one case to those imposed in reasonably similar cases constitutes one reasonable method by which a sentencing court may seek to fashion a proportionate sentence.

It may well be that judges initially will primarily consider reasonably similar cases decided by themselves or by geographically proximate judges.[6]

---

[6] Justice Corrigan expresses her belief that "case comparison will [not] become meaningfully less arbitrary over time," and that there exists a "potential to increase disparities in local sentencing practices." *Post* at 3 n 2. However, better that there be imperfect comparisons than no comparisons at all, as apparently preferred by Justice Corrigan. Over time, as sentencing data accumulate under the guidelines, as I believe it will, such comparisons will increasingly tend to become valuable in achieving reasonable sentencing uniformity and proportionality. I fail
(continued…)

7

Thus, there may be some anecdotal or arbitrary quality to this process, which must be cautioned against. However, over time, as the guidelines, and judicial interpretations of these guidelines, become more deeply embedded in our justice system, it may be expected that more sentencing data will be collected and maintained, and that judges will possess some greater capacity to search broadly for relevant cases with which to compare their own. Especially as more appellate decisions are rendered with regard to departure sentences, case comparisons should become increasingly useful and less a matter of happenstance.

Thus, along with analogizing to the sentencing grid, one additional method for justifying a particular departure is to simply look to sentences imposed in reasonably similar cases. Given the current limited availability of such information in the legal marketplace, this will not always be possible, but where it *is* available, it should be welcomed and used. In appropriate instances, such information can assist the sentencing court in properly placing a case along a continuum of reasonably similar cases, and thereby fashioning a more proportionate and uniform sentence.

Stephen J. Markman

---

(…continued)
to see any "inconsisten[cy]," *id*., in my belief that comparisons of cases constitute one essential and obvious means of furthering these goals.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                     No. 134682

GARY THOMAS SMITH,

      Defendant-Appellant.

_____

WEAVER, J. (*dissenting*).

I dissent from the majority's decision to remand this case to the trial court for resentencing. I disagree that the trial court failed to explain why it made the specific departure it imposed as a sentence in this case. For the reasons stated in the judgment of the Court of Appeals, as set forth below, I would affirm that judgment, which affirmed the trial court's departure from the sentencing guidelines:

> Finally, the trial court must consider proportionality. If a trial court finds that there are substantial and compelling reasons to believe that sentencing a defendant within the [sentencing] guidelines range would not be proportionate to the seriousness of the defendant's conduct and criminal history, then the trial court should depart from the guidelines. [*People v*] *Babcock,* [469 Mich 247,] 264 [666 NW2d 231 (2003)]. "In considering whether, and to what extent, to depart from the guidelines range, a trial court must ascertain whether taking into account an allegedly substantial and compelling reason would contribute to a more proportionate criminal sentence than is available within the guidelines range." *Id.* at 272, citing MCL 769.34(3). "In determining whether a sufficient basis

exists to justify a departure, the principle of proportionality—that is, whether the sentence is proportionate to the seriousness of the defendant's conduct and to the defendant in light of his criminal record—defines the standard against which the allegedly substantial and compelling reasons in support of departure are to be assessed." *Id.* at 262. In other words, the principle of proportionality requires that a sentence "be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Milbourn,* 435 Mich 630, 636, 651; 461 NW2d 1 (1990).

"This Court reviews for clear error a trial court's factual findings at sentencing." *People v Mack,* 265 Mich App 122, 125; 695 NW2d 342 (2005). Specifically, the "existence or nonexistence of a particular sentencing factor is a factual determination for the sentencing court to determine, and should therefore be reviewed by an appellate court for clear error." *People v Babcock*, 469 Mich 247, 273; 666 NW2d 231 (2003) (internal quotation marks, brackets and citations omitted). "The determination that a particular sentencing factor is objective and verifiable should be reviewed by the appellate court as a matter of law." *Id.* (internal quotation marks, brackets and citations omitted). Finally, a "trial court's determination that the objective and verifiable factors present in a particular case constitute substantial and compelling reasons to depart from the statutory minimum sentence shall be reviewed for abuse of discretion." *Id.* at 274 (internal quotation marks and citations omitted). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the permissible principled range of outcomes." *Id.*

Here, defendant's guidelines range, for the minimum sentence, was 9 to 15 years. The trial court sentenced defendant to a minimum of 30 years' imprisonment. At sentencing, the trial court stated reasons for the departure:

"Certainly it is an objective and verifiable fact that the defendant stood in the role of a parental figure for a child who had none. That was a child who was sexually exploited over a period of 15 months. That's verifiable.

"These are characteristics that I think don't adequately get covered in the guidelines. They don't. I meant it's unimaginable to me to think that a 10 year old who may be fearful of the fact that she may loose [sic] the roof over her head for herself, her mother and her two siblings, is forced to silently endure this kind of sexual exploitation.

2

"The guidelines didn't calculate that, but I am."

In the Departure Evaluation Form, the trial court reiterated the previously stated reasons for departing from the guidelines' recommended minimum sentence range, and added an additional reason:

"Defendant served as child care provider for nine years and molested the victim over a 15 month period.

"Defendant threatened to evict the child victim and her family if she told anyone about the [criminal sexual conduct].

"Child victim was forced to undergo a painful physical exam as a result of the incident."

We conclude that the articulated reasons for the departure were objective and verifiable. [*People v*] *Abramski*, [257 Mich App 71, 74; 65 NW2d 501 (2003)]. It is objective and verifiable that defendant served as child care provider for nine years. The lower court record reveals that, with the exception of a three year period, defendant and [his wife, Carol Smith,] provided child care for the victim in their home from the time she was one year old in 1994 until the victim was 10 years old. During the time the victim was out of defendant's home, he kept in close contact with her through cards and phone calls. According to defendant's own testimony, the victim "became like part of the family" during the time he cared for her.

Additionally, the lower court record reveals that the sexual abuse occurred over a period of 15 months. The first incident occurred sometime in May 2002, when the victim was nine years old. The last incident took place sometime at the end of July 2003, approximately three weeks before the victim revealed the allegations on August 20, 2003. The jury necessarily found that these instances of abuse occurred, because it found defendant guilty on all three counts. Thus, the fact of the abuse over this period of time has been objectively verified by the trier of fact. Thus, it is objective and verifiable that defendant served as child care provider for many years and molested the victim over a period of 15 months.

It is also objective and verifiable that defendant threatened to evict the victim and her family. This threat is not based solely on the testimony of the victim, because it is not disputed that defendant

3

threatened to evict the victim and her family. Finally, it is objective and verifiable that the victim was forced to undergo a physical examination as a result of the abuse. There can be no reasonable dispute that the victim was subjected to a physical examination on August 22, 2003.

The trial court did not abuse its discretion in determining that these factors constituted substantial and compelling reasons for an upward departure. *Babcock, supra* at 264-265. In determining whether the departure was proper, this Court must defer to the trial court's direct knowledge of the facts and familiarity with the offender. *Id.* at 270. Defendant chose a victim who was nine years old and preyed on her vulnerability and sense of security as a member of defendant's household. Contrary to defendant's argument on appeal, a review of the sentencing transcript shows that the trial court did not rely on Carol's accusations regarding the prosecutor in determining whether to depart from the guidelines. Defendant's argument in this regard is mere speculation. As the trial court indicated, it is apparent that the sentencing guidelines were not capable of adequately accounting for the true seriousness of these offenses.

Finally, defendant argues that the upward departure from the recommendation of the guidelines was not proportionate. We disagree. The trial court's upward departure was proportionate to defendant and the seriousness of the offense. The trial court addressed the offender, and the sentencing transcript demonstrates that the sentence was individualized. Contrary to defendant's argument on appeal, lack of a prior record is not sufficient to overcome the presumption of proportionality. See *People v Piotrowski,* 211 Mich App 527, 533; 536 NW2d 293 (1995*).* Moreover, the circumstances surrounding the instant offenses establish the serious and reprehensible nature of defendant's crimes. Appellate courts should consider whether the circumstances surrounding a defendant's conviction place that defendant in the least or most threatening class with respect to that particular crime. *Milbourn, supra* at 654. The record reveals that defendant engaged in the continued sexual assault of a minor child on numerous occasions over a 15 month period. Most of these instances occurred while the victim's siblings and mother were in the home. After a review of the entire record, we conclude that the sentences imposed by the trial court are proportionate to the seriousness of the crimes, and thus, do not violate the principle of proportionality. *Babcock,*

4

*supra* at 264, 273.  [*People v Smith,* unpublished opinion per curiam of the Court of Appeals, issued July 19, 2007 (Docket No. 267099), pp 4-6.]


Elizabeth A. Weaver

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v

No. 134682

GARY THOMAS SMITH,

     Defendant-Appellant.

---

CORRIGAN, J. (*dissenting*).

I respectfully dissent. Circuit Judge Timothy M. Kenny more than adequately justified the 30-year minimum sentences he imposed for defendant's repeated sexual exploitation of his 10-year-old victim. Indeed, the judge was statutorily authorized to impose a *life* sentence for defendant's crimes.[1] Judge Kenny fully complied with his duty under MCL 769.34(3) to state his reasons for "that departure" imposed. The statute does not require a trial judge to chart the sentence imposed for a particular crime by locating it on an elusive spectrum of hypothetical offenses as the majority today mandates. In effect, the majority enacts a new, corollary sentencing regime by extending the sentencing guidelines to apply to departure sentences. In doing so, the majority's approach directly

---

[1] Under MCL 750.520b(2), defendant was automatically eligible to serve a life sentence for each of his three convictions for first-degree criminal sexual conduct.

contradicts *People v Babcock*, 469 Mich 247; 666 NW2d 231 (2003), and *People v Fields*, 448 Mich 58; 528 NW2d 176 (1995). *Babcock* applied the *Fields* Court's definition of "substantial and compelling reasons" to that phrase as it appears in MCL 769.34. *Babcock*, 469 Mich at 257. The very purpose of requiring a trial judge to articulate such reasons was to allow for exceptions to statutorily defined sentences *while restricting individual judges' abilities to depart*. *Fields*, 448 Mich at 68-69. Thus, legislatively imposed restrictions on departure are inherent in the definition of "substantial and compelling reasons" and provide the safety valve necessary for an appellate court to gauge whether a trial judge abused his sentencing power. The majority wrongly concludes that a new, judicially imposed regime is necessary for meaningful appellate review.

Although the majority's approach may provide helpful guidance to trial judges in some cases, I respectfully contend that it is not in our power to impose new, mandatory sentencing requirements that the Legislature has not chosen to adopt for departures. The legislative scheme requires appellate courts to *review the record* to determine whether the facts support the departure. It does not require courts to posit a continuum of hypothetical similar crimes and locate the sentencing offense on that continuum. Moreover, I fear that complying with the majority's proposed requirements will be essentially impossible in many cases and appellate review will not be aided. I would affirm defendant's sentences instead of imposing a new layer of unjustified burdens on the trial bench.

Significantly, I have no qualms with many of the majority's general statements. I agree that the trial court "bears the burden of articulating the rationale for . . . departure," that the court "must articulate substantial and compelling reasons that justify the departure it made," and that its articulation "must be sufficient to allow adequate appellate review." *Ante* at 28-29. I also agree that, to be proportionate, a minimum sentence that falls outside the guidelines range "must be more appropriate to the offense and the offender than a sentence within the guidelines would have been." *Ante* at 29. Further, it *may* be "*appropriate* to justify the proportionality of a departure sentence by . . . anchoring it in the sentencing guidelines." *Ante* at 29 (emphasis added).[2] But despite its permissive language,[3] the majority effectively mandates its new regime.

---

[2] It also may be helpful to compare sentences in similar cases, as Justice Markman suggests. I do not oppose trial courts' attempts to do so. My central point is that our statutory scheme simply does not require this exercise. Moreover, because each case is unique, the comparison Justice Markman advocates may not always be possible or productive. Significantly, Justice Markman concedes that his approach may have "some anecdotal or arbitrary quality . . . . " *Ante* at 8. I agree. But I also question whether case comparisons will become meaningfully less arbitrary over time, as Justice Markman supposes, if judges "consider reasonably similar cases decided by themselves or by geographically proximate judges." *Ante* at 7. Rather, such comparisons have the potential to increase disparities in local sentencing practices, contrary to Justice Markman's stated goal of statewide consistency in guidelines sentencing. Thus, Justice Markman's position that judges should compare similar cases before imposing a sentence outside the guidelines range, which would likely lead to inconsistent sentencing practices in regions throughout the state, is inconsistent with his position that courts should ensure uniform sentences.

[3] The majority explicitly states that a trial court "is not *required* to consider where a defendant's sentence falls on the sentencing range grid," and that
(continued…)

3

As is clear from this case, a departure sentence—indeed, a sentence that is not even the highest possible for the offense—for a crime that we unanimously agree is "heinous," see *ante* at 19, is being vacated because the trial court did not comply with the majority's new requirements. Accordingly, I dissent both because I believe that Judge Kenny met the requirement of articulation in this case and because I think that the majority poses an overly burdensome and often impossible task on sentencing courts that is outside the scheme for departures that our Legislature adopted.

The majority acknowledges that, as a reviewing court, we are bound to give significant deference to a trial court's sentencing decisions. *Ante* at 7. Most significantly, we review for an abuse of discretion the trial court's determination that particular facts are substantial and compelling reasons for the departure imposed. *Babcock*, 469 Mich at 264-265. *Babcock* succinctly circumscribed the abuse of discretion standard of review in this context:

> At its core, an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome. When the trial court selects one of these principled outcomes, the trial court has not abused its discretion and, thus, it is proper for the reviewing court to defer to the trial court's judgment. *An abuse of discretion occurs*, however, *when the trial*

---

(…continued)
appellate review is merely "aided" when a court compares its reasons for departure to facts describing a real or hypothetical crime meriting the same sentence. *Ante* at 18-19.

4

*court chooses an outcome falling outside this principled range of outcomes.* [*Id.* at 269 (emphasis added; citations omitted).]

In *Babcock,* we thoroughly analyzed the distinct duties of the trial court and reviewing court. In rejecting de novo review and adopting the abuse of discretion standard, we observed: "Because of the trial court's familiarity with the facts and its experience in sentencing, the trial court is better situated than the appellate court to determine whether a departure is warranted in a particular case." *Id.* at 268. We further stated:

> The structure and content of the sentencing guidelines, as well as the organization of the appellate system itself, plainly reveal the Legislature's recognition that the trial court is optimally situated to understand a criminal case and to craft an appropriate sentence for one convicted in such a case.
>
> * * *
>
> It is clear that the Legislature has imposed on the trial court the responsibility of making difficult decisions concerning criminal sentencing, largely on the basis of what has taken place in its direct observation. [*Id.* at 267-268.]

The trial court's preeminence in the sentencing arena is reflected in the plain language of the statutory sentencing scheme, which provides that the court "may" depart from the appropriate range, MCL 769.34(3), and may even depart on the basis of an offense characteristic taken into account by the guidelines if the court concludes that the guidelines give it inadequate or disproportionate weight, MCL 769.34(3)(b). *Babcock*, 469 Mich at 267-268. MCL 769.34(11) provides a basis for the appellate court's role:

> If, *upon a review of the record*, the court of appeals finds the trial court did not have a substantial and compelling reason for

5

departing from the appropriate sentence range, the court shall remand the matter to the sentencing judge or another trial court judge for resentencing under this chapter. [MCL 769.34(11) (emphasis added).]

Accordingly, an appellate court's task is to *review the record* to determine whether the facts support the departure. Remand for resentencing is warranted *only* if the record does not support the departure.[4]

The majority's current decision is inconsistent with MCL 769.34, *Babcock*, and *Fields*. The text of MCL 769.34(3) bears repeating:

A court may depart from the appropriate sentence range established under the sentencing guidelines set forth in chapter XVII if the court has a substantial and compelling reason for that departure and states on the record the reasons for departure. [MCL 769.34(3).]

---

[4] I agree with the majority that "appellate courts may not review the record *to search for reasons to uphold a sentence that the trial court failed to justify.*" *Ante* at 24 n 50, citing *Babcock*, 469 Mich at 258-259. Rather, an appellate court reviews the record to determine whether the record supports the trial court's reasons for departure. My central point is that an appellate court's role is to *review the record* for an abuse of discretion*,* not to legally analyze the trial court's attempts to derive the departure from the guidelines or analogize it to other cases. Indeed, although Justice Markman accuses me of promoting merely "rudimentary appellate review," *ante* at 5, my fear is that the majority's formula will promote incomplete scrutiny of departure sentences. Instead of carefully reviewing the entire record to determine whether a trial court's sentence falls outside the range of principled outcomes, under the majority's view an appellate court can restrict itself to the sentencing transcript to check for an adequate quantitative argument or comparison to other cases. By permitting appellate courts to restrict their review to the sentencing transcript and a comparison with other cases, rather than requiring a complete review of the facts as recounted in the entire record, the majority permits what resembles de novo review of a legal question, which we explicitly rejected for departure sentences in *Babcock* in favor of the abuse of discretion standard.

6

Thus, the sentencing court is obligated to have "a substantial and compelling reason for that departure" and to "state[] on the record the reasons for departure." As I explained in my partial dissent to the *Babcock* decision, these are the sole elements that the statute requires to justify a departure sentence. *Babcock*, 469 Mich at 275 (Corrigan, J., dissenting in part). The *Babcock* majority went further than I would have, imposing a burden of articulation that is absent from the statute. See *id.*, part III(C), at 258-261. Significantly, however, even the majority agreed that "[a]lthough the trial court must articulate a substantial and compelling reason to justify its departure, *the trial court is not required to use any formulaic or 'magic' words in doing so.*" *Id*. at 259 n 13 (emphasis added). Indeed, the majority explicitly counseled that the trial court *need not* "explain why it chose a twelve-month departure as opposed to an eleven-month departure (or indeed as opposed to any one of countless other potential departures)."[5] *Id.* at 260 n 14. Rather, "however it is articulated, the quality of the trial court's statement must be sufficient to allow for effective appellate review." *Id.* at 259 n 13. The current

---

[5] I agree with Justice Markman that "there is a considerable difference between a 16-year and a 30-year minimum sentence." *Ante* at 3. But, as *Babcock* explicitly counsels, a trial court is not required—and indeed may not be able—to precisely quantify the reasons for the precise departure sentence imposed. Still, in choosing not to impose such a requirement, the statutory scheme does not "essentially exempt . . . that part of a potential criminal sentence lying outside the guidelines range . . . from even rudimentary appellate review." *Ante* at 4-5. Record review of the reasons for departures is anything but rudimentary, as our work in this case itself most poignantly and painfully illustrates. Appellate courts are fully capable of fulfilling their task of reviewing the record to discern whether the facts support the departure as an appropriate exercise of discretion.

majority cites its decision in *Babcock* and claims: "We do not suggest that trial courts must sentence defendants with mathematical certainty." *Ante* at 20-21. Yet the majority now requires mathematical charting and magic words. In doing so, it abandons the abuse of discretion standard inherent in appellate courts' review of trial courts' sentencing decisions. Instead of acknowledging that there will always be a range of principled outcomes, the majority requires a trial court to impose sentences with precision and locate each sentence on an elusive scale of possible sentences for the underlying conviction. No longer must a reviewing court "proceed with a caution grounded in the inherent limitations of the appellate perspective." *Id*. at 270.

Requiring precise comparisons of sentences for different hypothetical crimes and offenders also establishes a task for trial courts that is both potentially impossible *and* unnecessary to limit their discretion or facilitate review. The Legislature affirmatively chose to limit trial courts' discretion by requiring them to articulate "substantial and compelling reasons." The phrase "substantial and compelling" had become a legal term of art which originated from this Court's definition in *Fields*. *Babcock*, 469 Mich at 257. *Fields* established—on the basis of definitions of the words "substantial" and "compelling"—that such reasons must "'keenly' or 'irresistibly' grab our attention" and be "'of considerable worth' in deciding the length of a sentence." *Fields*, 448 Mich at 67. Such reasons also must be "objective and verifiable." *Id.* at 68. Requiring reasons for departure to

8

be objective and verifiable "maintain[s] the limited but moderating effect intended by the Legislature" in allowing for departures. *Id.* The standard "allows judges to consider many of the factors traditionally utilized in formulating sentences" while "also provid[ing] sufficient restrictions to assure that the Legislature's intent . . . will not be subsumed by the use of what is intended to be an exception to the rule . . . ." *Id.* at 68-69. Thus, the standard itself embodies limits for departure that appellate courts are capable of reviewing. It is no accident, therefore, that the trial court need *only* articulate "substantial and compelling reasons" for a departure sentence to survive review under MCL 769.34(11) (resentencing is appropriate only if "the court of appeals finds the trial court did not have a substantial and compelling reason for departing from the appropriate sentence range"). More is unnecessary because the range of substantial and compelling reasons is inherently limited. As I will explain further, this standard also reflects the potential impossibility of articulating reasons for a particular number of months or years of departure in any meaningful, reviewable way.

Although the majority calls for uniformity among departure sentences, *ante* at 20-22, 24, the majority cites no controlling statutory provision prescribing the methods it requires to achieve such uniformity. The majority cites only MCL 769.33(1)(e)(iv), which has been repealed. 2002 PA 31. Moreover, this repealed statutory provision merely provided direction to the Sentencing Commission regarding ways to modify the sentencing guidelines. It did not delineate a judge's

9

duties in imposing a sentence outside of the guidelines. Further, although MCL 769.33(1)(e)(iv) provided that the Sentencing Commission should develop modifications to the sentencing guidelines that "[r]educe sentencing disparities," it did not require the standard of uniformity envisioned by the majority for sentences outside the guidelines range. Because of their unusual nature, departure sentences are not governed by the general rule of uniformity applied to those more common offenses that fit within the mold of the guidelines. "Departure" is defined, in pertinent part, as "divergence or deviation, as from a standard or rule." *Random House Webster's College Dictionary* (2001). Thus, departure sentences should by definition be governed by a different standard than sentences within the guidelines range. By choosing to permit judges to "depart" from the guidelines range for unusual offenses, the Legislature contemplated a less stringent standard of uniformity for unusual offenses, which should because of their nature be treated differently.[6] Departure sentences generally involve less quantifiable[7] facts that are

---

[6] I agree with the majority that appellate courts should not impose a less stringent *standard of review* (i.e., abuse of discretion) on departure sentences, *ante* at 25 n 51, but I disagree that the Legislature intended to bind trial courts departing from the sentencing guidelines range to the standard of uniformity required for sentences within the guidelines.

[7] Justice Markman argues that the facts in cases involving departure sentences are just as quantifiable as the facts in cases in which the sentence is within the guidelines. If the facts of a case are quantifiable, however, then they can be scored adequately by the offense and prior record variables, thus resulting in a sentence within the guidelines range. It is when objective and verifiable factors exist that cannot adequately be scored by the offense and prior record variables (i.e., they are not adequately quantifiable) that a departure sentence

(continued…)

10

not adequately covered by the normative guidelines.[8]  In *Babcock*, 469 Mich at 264, this Court explained that a sentencing court departing from the guidelines range "must consider whether its sentence is proportionate to the seriousness of the *defendant's* conduct and *his* criminal history . . . ."  (Emphasis added.)  By effectively requiring sentencing courts to compare the defendant's conduct and criminal history to *other defendants'* conduct and criminal histories, the majority has created a standard of uniformity not required by statute or *Babcock*.

_____

(…continued)
results.  Thus departure sentences by their nature involve less quantifiable facts than sentences within the guidelines.

[8] Moreover, the majority does not acknowledge the extent to which the standards for departure sentences parallel those for guidelines sentences.  The majority fears that my view would lead to "[a]ny arguably reasonable sentence [being] upheld."  *Ante* at 24.  I conclude that this is precisely what the Legislature intended for both departure sentences and nondeparture sentences.  Departure sentences are constrained by the statutory maximum and the rule requiring that a minimum sentence not exceed ⅔ of the maximum, MCL 769.34(2)(b).  Within this range, a departure sentence is reasonable if it is supported by a substantial and compelling reason.  MCL 769.34(3).  Similarly, a nondeparture sentence is constrained by the minimum guidelines range.  MCL 769.34(2).  A sentence is presumptively reasonable if it falls within this range and must be affirmed.  MCL 769.34(10).  Thus, departure and nondeparture sentences are accorded appellate deference if they fall within the statutorily constrained parameters.  Because a sentencing judge need not justify the exact nondeparture sentence he imposes within the minimum guidelines range, there is nothing novel about the Legislature's decision not to require quantification of a departure sentence that otherwise complies with the statutory constraints for departure sentences.  Indeed, by requiring quantification of departure sentences, the majority erects a higher bar for departure sentences with regard to uniformity than exists for guidelines sentences themselves.  This cannot be the correct result; by design, departure sentences are appropriate in cases that defy norms and do not easily lend themselves to common offense and offender characteristics.

This case exemplifies the majority's mistake in requiring trial courts to offer burdensome articulations of their sentencing decisions mandated neither by MCL 769.34(3) nor precedent from this Court. The facts of this case clearly reveal that the 30-year minimum sentence imposed is within the range of principled outcomes. These facts also reinforce the *Babcock* Court's conclusion that "[t]he deference that is due [to the trial court under the abuse of discretion standard] is an acknowledgement of the trial court's extensive knowledge of the facts and that court's direct familiarity with the circumstances of the offender." *Babcock*, 469 Mich at 270. The trial court's sentence is firmly rooted in the heinous nature of this case, in which the child victim effectively became the sexual prisoner of her adult caretaker and landlord, who threatened to put the child's family out into the street if she did not submit to his abuse.

The single mother of the victim first met defendant and his wife when the little girl was just over one year old. The mother sought day care for her daughter and responded to an ad placed in the paper by defendant's wife. Several of his wife's ads were introduced at trial; she advertised her babysitting services[9] as a "mom away from home" in a "healthy," "experienced, loving, clean environment." Defendant's wife cared for the child in her home intermittently. The child and her younger sister later began staying with defendant and his wife (the Smiths) for

---

[9] Defendant's wife emphasized at trial that she did not operate a licensed day care business. She merely wanted to "baby-sit a couple of children."

long stretches, including over whole summers. The Smiths also took in the children for nine months when their mother was living in a halfway house.

The Smiths testified that the child was initially afraid of everyone or "afraid of men." But all the witnesses agreed that, over time, defendant and the child developed a father-daughter relationship. The child testified that she loved the Smiths, who sent her gifts and cards even when she was not in their care.[10] The Smiths testified that they began to think of the child as their own. Defendant, whom she sometimes called "daddy," was the only consistent male role model in her life.

Defendant molested the child over a 15-month period when she was nine and ten years old. The abuse began when she and her sister moved in with the Smiths during a summer while their mother was still living in Georgia and preparing to move the family back to Michigan. In the fall when she returned to Michigan, the mother, who was in financial straits, and her infant son also moved in with the Smiths at the request of defendant's wife but over defendant's objection. Defendant's abuse of the child continued when defendant's wife worked on her computer in the basement[11] and the child's mother was either at

_____

[10] The child's mother frequently moved the family between Michigan and Georgia.

[11] Several witnesses confirmed the child's testimony that defendant's wife spent hours in her basement "office" using her computer during the evening. Defendant claimed, to the contrary, that he was with his wife "24 hours a day, seven days a week" because his wife was agoraphobic. Other points of the
(continued…)

13

Smiths' testimony clearly belied this claim. For instance, they did not sleep in the same room; rather, they testified that she went to bed early and slept in their bedroom while he watched television and slept in the living room where the abuse took place. Defendant also denied that his wife had a computer in her basement office. His wife initially supported his testimony; she claimed that she used a laptop in the living room and not in the basement. She later conceded, however, that she used the computer at night in the basement.

These are but some examples of the apparent inconsistencies within and between defendant's testimony and that of his wife. The regular inconsistencies, as well as the couple's behavior at trial, shed light on the trial judge's observations at sentencing. For instance, the judge observed that in addition to sexually abusing the child who had come to utterly trust defendant, defendant then added to the child's ordeal by casting her as a liar at trial. In all, the child was subjected to two trials, and the judge opined that defendant and his wife attempted to spur a second mistrial by accusing the trial prosecutor of cocaine use during the lunch breaks. During the second trial, defendant's wife engaged in behavior that, after a hearing outside the jury's presence, the judge characterized as "stalking" the prosecutor. Defendant's wife made repeated calls to state police at the Downriver Area Narcotics Organization to lodge complaints against the prosecutor and encourage the officers to investigate. The officers stated that defendant's wife claimed to have followed the prosecutor in her car at lunch breaks during the trial (it is unclear from the transcript whether defendant, who was free on bond, was with her at these times). His wife reported the prosecutor's license plate number and claimed to have seen her using cocaine during the lunch breaks before returning to the courtroom. When called on by the judge to respond to the officers' statements, defendant's wife denied that she ever told them that she followed the prosecutor or reported seeing her use cocaine and claimed that she only reported her suspicions of drug abuse because of the prosecutor's behavior in the courtroom. She claimed that she only wanted to get the prosecutor some help. Judge Kenny opined that the timing of her behavior indicated that, at a minimum, she hoped to cause embarrassment for the prosecutor during the trial and, likely, she hoped to cause the prosecutor's arrest and another mistrial. Judge Kenny clearly surmised that defendant was involved in some way with these attempts to malign the prosecutor; the judge ultimately revoked defendant's bond in an attempt to curb this disruptive and threatening behavior. The judge characterized the behavior exhibited by defendant's wife as "reprehensible," banned her from the courtroom, and encouraged the prosecutor to seek a personal protection order. He opined: "In 31 years . . . working in the criminal justice system, I have never seen anything . . . that stooped to the depth of effort to try to tamper with the

(continued…)

14

work or in her bedroom. When defendant and the child were alone in the living room watching television and the child was lying down on the couch, he would put his hand down her pants and use his fingers to penetrate and rub her genitals and anus. She testified that defendant's acts "hurt" and made her feel like her skin was "stretching." The child would leave the room when she could. She testified that she would attempt to move her body away from defendant's hand, but he would often stiffen his arm so she could not move.[12] On one occasion, defendant also rubbed himself and made a "wet spot" on his shorts. On this occasion, he told the child that he would "kick [her] family out" of the house if she told anyone about the abuse.

The child testified that she initially did not tell anyone what defendant was doing to her because she was too embarrassed, upset, and afraid of defendant's threats to evict her family. Ultimately, about a month after the last incident of abuse, she asked a friend's teenaged brother whether "he would ever hurt a little girl while they [sic] are sleeping." She then began sucking her thumb. Her

---

(…continued)
integrity of this particular trial or trial process. The only thing that would be worse would be trying to shoot a witness or the prosecutor." Indeed, in keeping with the majority's approach despite my disagreement with it, on remand I would note that these events could have been considered under offense variable (OV) 19, which addresses interference with the administration of justice but which was not initially scored in this case. Arguably, even a score for OV 19 would not adequately account for the level of interference Judge Kenny found in this case.

[12] It is worth noting that, according to the record, defendant stands six feet and two inches tall and weighs between 290 and 311 pounds.

behavior spurred him to ask her what was wrong. She revealed the abuse after asking him not to tell anyone her secret. The boy testified that, when she told him, he was "in complete shock." He could not sleep and concluded that he "couldn't live with [a secret] like that." The next morning, he convinced the victim to tell his mother and sister about the abuse.[13]

The boy's mother then reported the abuse to defendant's wife and the victim's mother. The victim told her mother that the allegations were true. As the victim's family gathered their things to immediately leave the Smiths' house, defendant's angry wife accused the victim's mother of lying and spat in her face. Defendant, whose wife had repeated the allegations to him, sat quietly in a chair throughout the ordeal. At trial, he testified that the child's allegations were untrue.

After leaving the Smiths' home, the child's mother called the police, who took the child's statement and advised her mother to take her to the hospital where she was examined for signs of sexual abuse. The child described the complete genital and anal exam as uncomfortable and embarrassing. The pediatric emergency room doctor who examined her testified that the child, who was then ten years old, reverted to thumb-sucking during the exam process.

Defendant was charged with three counts of first-degree criminal sexual conduct involving the sexual penetration of a child under 13 years old. A brief review of the defense theory provides a useful background for the trial judge's

---

[13] His mother described the victim as "crying and crying" and "shivering."

16

later comments at the sentencing hearing. The defense initially stressed the questionable character of the victim's mother. Defense counsel noted an allegation made by defendant's wife that, after the preliminary examination in this case took place, someone who sounded like the victim's mother telephoned her and asked for $20,000 to make the case "go away."[14] Counsel argued that the

_____

[14] Very little evidence of this purported call was presented at trial and defense counsel only mentioned it in passing during his closing argument. At the time of the call, defendant's wife did not file a report or contact the police officers investigating the case. Rather, she stated that she called a "dispatch" officer who she claimed told her to contact her phone company and have a tracer placed on her phone. A friend of the Smiths testified that she was at their home on the day of the call and that she recognized the voice of the victim's mother demanding money. She stated that defendant's wife had recognized the out-of-state number on her caller I.D. box and asked the friend to listen on the other line. No phone company reports or other direct evidence of the call were submitted into evidence. Indeed, the prosecutor argued that defendant's wife and her friend fabricated the call, particularly in light of the friend's convenient presence when the purported call was made, their failure to report it to the investigating officers, and their incredible claims that defendant's wife was told to put a "tracer" on the phone although the caller I.D. box purportedly showed the caller's phone number.

Further, there are obvious similarities between the accusations made by defendant's wife against the victim's mother and those she made against the prosecutor. Defendant's trials were rife with his wife's constant pattern of implausible accusations against participants in the case. Judge Kenny was in the best position to gauge any encouragement of her behavior by defendant. At a minimum, the record does not reveal any efforts by defendant to curb the behavior. I note these issues because her behavior formed part of the context of the trial and sentencing decisions, by their nature, "'grow [] out of, and [are] bounded by, case-specific detailed factual circumstances.'" *Babcock*, 469 Mich at 268, quoting *Buford v United States,* 532 US 59, 65; 121 S Ct 1276; 149 L Ed 2d 197 (2001). To the extent that Judge Kenny concluded defendant was complicit in his wife's acts, the record further supports the judge's observation at sentencing that, in addition to the incredibly exploitative abuse itself, defendant added to the child's ordeal by categorizing her as a liar. Indeed, defendant did so during two

(continued…)

17

child's allegations "could be an imagined thing" and were like a "lie" or a "rumor." Counsel also argued that the ten-year-old victim may have made up the story in order to spend more time with her friend's teenaged brother, on whom she may have had a romantic crush. Counsel further suggested that the child did not appear traumatized because she continued to do well at school throughout the ordeal.

The jury found defendant guilty of each of the three counts of first-degree criminal sexual conduct. The trial judge imposed a departure sentence of 30 to 50 years' imprisonment for each count. Judge Kenny's full reasons for departure are recounted in the majority opinion, *ante* at 3-5. Judge Kenny stressed that the case "manifests the absolute worst type of exploitation." Over a period of 15 months defendant forced a child with no other adult males in her life, who was "fearful of the fact that she may lose the roof over her head for herself, her mother, and her two siblings," to "silently endure" repeated sexual penetrations. Judge Kenny also noted that the ordeal forced the young victim to undergo a "frightening gynecological type of examination certainly adding to the trauma in this particular case." Finally, defendant "blame[d] the child" and "categorize[d] her as a liar."

As the majority acknowledges, Judge Kenny thus identified objective and verifiable facts underlying his sentencing decision, each of which is supported by

(…continued)
trials and, had his wife spurred a second mistrial, the child would have been forced to endure a third trial.

18

the record.  *Ante* at 8-9.  Contrary to some of the majority's conclusions, however, I conclude that the judge also did not abuse his discretion in deciding that these facts were substantial and compelling reasons to impose a 30-year departure sentence.[15]

First, I agree with the majority that Judge Kenny was not barred from relying on defendant's exploitation of his position as a caregiver to the child by MCL 769.34(3)(a), which prohibits a judge from departing on the basis of a defendant's lawful occupation.  *Ante* at 5 n 3.  Judge Kenny appropriately cited defendant's "cho[ice] to exploit [his] relationship" with the victim—or to abuse his status as a "child care provider"—as a reason for departure.  Defendant preyed on a child to whom he became like a father—and who had no other men in her life to protect her—by taking advantage of his wife's solicitation of the child to their care by advertising a safe environment for children.  By its terms, MCL 769.34(3)(a) could not apply to this case because defendant was *not* lawfully employed as a child care provider; indeed, he and his wife testified that he was rarely involved with her unlicensed babysitting services.  But even if defendant

---

[15] Consistent with my dissent in *Babcock,* I would affirm defendant's sentences because Judge Kenny stated one or more substantial and compelling reasons for departure and the sentence imposed was not outside the range of principled outcomes.  MCL 769.34(3) and (11) require no more in order for a departure sentence to survive appellate review.  *Babcock*, 469 Mich at 274-277 (Corrigan, J., dissenting in part).  But the sentence is also sound, and remand is not required, under the majority opinion in *Babcock*, as I will explain.

19

had worked as a child care provider, his *exploitation* of that role—as opposed to the mere fact of his lawful occupation—would be a sound reason for departure.[16]

Second, I also agree with the majority's conclusion that the gynecological examination underwent by the 10-year-old victim is a substantial and compelling reason to depart under the circumstances of this case. *Ante* at 10. This case involves a 10-year-old girl undergoing the first gynecological exam of her life under the auspices of criminal investigation. Further, the child's reversion to thumb-sucking during the embarrassing, uncomfortable exam was apparently a noteworthy fact in this case; the experienced pediatric emergency room doctor explicitly remembered this fact and remarked on it at trial. Under these circumstances, the trial judge reasonably concluded that the exam "add[ed] to the trauma in this particular case" and, therefore, was one of several factors that contributed to his decision to depart from the minimum guidelines.

I strongly disagree, however, with the majority's conclusion that the trial court's reasons did not justify the 30-year minimum sentence (in the language of MCL 769.34[3], "that departure") imposed. First, contrary to the majority's claim, *ante* at 10 n 21, the judge clearly stated that he departed in part on the basis of exploitation of the victim *because the level of exploitation here was not*

---

[16] MCL 769.34(3)(a) prohibits reliance on the mere fact of a defendant's occupation as a reason for departure. It reads in pertinent part: "The court shall not use an individual's . . . legal occupation . . . to depart from the appropriate sentence range."

*contemplated by the guidelines.* Offense variable (OV) 10 addresses predatory conduct, exploitation of a victim's age or size, and an offender's abuse of his position of authority or domestic relationship to complete a crime. MCL 777.40. MCL 769.34(3)(b) mandates:

> The court shall not base a departure on an offense characteristic or offender characteristic already taken into account in determining the appropriate sentence range unless the court finds from the facts contained in the court record, including the presentence investigation report, that the characteristic has been given inadequate or disproportionate weight.

Here, the judge listed *numerous* forms of exploitation such as defendant's abuse of a father-daughter type relationship, the age of the child, the child's particular vulnerability because she had no other males in her life, and defendant's act of extorting her silence by threatening eviction of her whole family. The judge thus concluded that the case involved the "worst type of exploitation." After citing *Babcock* and commenting on these facts, Judge Kenny stated that "[t]hese are characteristics that I think don't get adequately get covered in the guidelines." Thus, the judge did exactly what MCL 769.34(3)(b) and *Babcock* require; he explained that the OVs did not give adequate weight to the exploitation involved in this case. See *Babcock*, 469 Mich at 258 n 12. I see absolutely no justification in MCL 769.34 or *Babcock* for the majority's conclusion that the judge was also required to *explicitly* mention OV 10 in order to support his explanation. Rather, as required by statute, he stated that the offense "*characteristic* [of exploitation] has been given inadequate or disproportionate weight" by the guidelines. MCL

21

769.34(3)(b) (emphasis added). Even if it were necessary to name a particular OV, he referenced OV 10 in an obvious manner because that OV is entitled "exploitation of a vulnerable victim." MCL 777.40(1). Thus, I fail to understand how the majority is "unable to ascertain whether he believed the factor was given inadequate weight." *Ante* at 10 n 21. Moreover, I find it hard to believe that Judge Kenny may have "failed to recognize that the guidelines consider exploitation," *ante* at 10 n 21, not only because he is an experienced trial judge but because he acknowledged the guidelines range in this case as scored by the Department of Corrections; the score plainly included 10 points for OV 10. Requiring more of a trial judge here amounts to mandating the very sort of "magic" words that *Babcock* purported not to require. *Babcock*, 469 Mich at 259 n 13. It also runs counter to the majority's current claim that "precise" words are not "necessary … to justify a particular departure." *Ante* at 21, citing *Babcock* at 259 n 13.

In sum, I agree with the Court of Appeals panel that 30-year sentences are well within the range of principled outcomes for these heinous acts of abuse.[17]

_____

[17] Because of the timing of this case, we also happen to have a unique window onto whether our Legislature would conclude that a 30-year sentence is within the range of principled outcomes under these circumstances. Effective July 1, 2008, an adult who rapes a child, i.e., commits first-degree criminal sexual conduct against a child less than 13 years of age, *must* be imprisoned for a minimum term of *at least* 25 years. Such an offender is also still eligible for a life sentence. MCL 750.520b(2)(b), as amended by 2007 PA 163. Thus, if defendant had committed these offenses at a later date, he would be *required* to serve a

(continued…)

22

minimum sentence of 25 years or more. Moreover, the 25-year sentence would be mandatory even if there were *no* substantial and compelling reasons to depart upward. Judge Kenny's reasons for departure would certainly justify a 30-year minimum sentence (a mere increase of five years from the mandatory minimum) under the new scheme.

Further, on a national scale, a debate continues regarding whether capital punishment is an appropriate sentence for child rape. The United States Supreme Court recently struck down a statute providing for such punishment when the crime is not also intended to kill the child. *Kennedy v Louisiana,* ___ US ___; 128 S Ct 2641; ___ L Ed 2d ___ (2008). But, as Justice Alito observed in dissent, six states currently permit capital punishment for child rape convictions. *Id.* at ___, slip op at 2 (Alito, J., dissenting). Justice Alito also reasonably questions the *Kennedy* plurality's conclusion that there is genuinely a "national consensus" that capital punishment is inappropriate in such cases. *Id.* at ___, slip op at 1. Moreover, although Justice Kennedy's lead opinion also cited the absence of capital punishment as a sanction for child rape in the context of federal criminal law, *id.* at ___, slip op at 12-13, the Department of Justice belatedly observed that the Court was mistaken in this regard; the rape of a child is a capital offense under the law of the United States Military. See Linda Greenhouse, *Justice Department Admits Error in Not Briefing Court,* N.Y. Times, July 3, 2008 <http://www.nytimes.com/2008/07/03/us/03scotus.html> (accessed July 29, 2008). Justice Alito observed:

> [T]here are many indications of growing alarm about the sexual abuse of children. In 1994, Congress enacted the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program, 42 U.S.C. § 14071 (2000 ed. and Supp. V), which requires States receiving certain federal funds to establish registration systems for convicted sex offenders and to notify the public about persons convicted of the sexual abuse of minors. All 50 States have now enacted such statutes. In addition, at least 21 States and the District of Columbia now have statutes permitting the involuntary commitment of sexual predators, and at least 12 States have enacted residency restrictions for sex offenders. [*Id*. at ___, slip op at 9-11 (Alito, J., dissenting).]

He offered the following grim statistics:

> From 1976 to 1986, the number of reported cases of child sexual abuse grew from 6,000 to 132,000, an increase of 2,100%. A. Lurigio, M. Jones, & B. Smith, Child Sexual Abuse: Its Causes,

The trial judge's stated reasons adequately justify the departure and are sufficient for appellate review. Unlike the majority, it is not "unclear" to me "why a minimum sentence of 30 years' imprisonment is warranted for this defendant." *Ante* at 30. To the contrary, the record clearly supports the departure. The majority asserts that I "fail[] to identify where in the record the judge justified the *particular* departure imposed," and that I "cannot identify it because the trial judge failed to provide it." *Ante* at 21-22. Such comments exemplify the majority's incorrect reading of the statute and what it requires of the record for a departure sentence to survive review. The trial court is not required to state on the record with precision his reasons for the exact number of months or years he departs above the guidelines range. Rather, *the record must support the departure*. MCL 769.34(11) clearly requires the reviewing court to "review . . . the record" in order to evaluate whether "the trial court did not have a substantial and compelling

<hr>

(…continued)
Consequences, and Implications for Probation Practice, 59 Sep Fed. Probation 69 (1995). By 1991, the number of cases totaled 432,000, an increase of another 227%. *Ibid.* In 1995, local child protection services agencies identified 126,000 children who were victims of either substantiated or indicated sexual abuse. Nearly 30% of those child victims were between the age of four and seven. Rape, Abuse & Incest National Network Statistics, online athttp://www.rainn.org/get-information/statistics/sexual-assault-victims. There were an estimated 90,000 substantiated cases of child sexual abuse in 2003. Crimes Against Children Research Center, Reports from the States to the National Child Abuse and Neglect Data System, available at www.unh.edu/ccrc/sexual-abuse/Child%Sexual%Abuse.pdf. [*Id.* at ___ n 2, slip op at 9 n 2.]

reason for departing." But, instead of reviewing the record to determine whether the facts justify the departure imposed, the majority searches for statements quantifying the extent of departure. Despite its claims to the contrary, the majority requires a sentencing court to provide a quantitative analysis of how a particular departure relates to the offense variables, prior record variables, and sentencing grid. Such an explanation by the sentencing court *may* be helpful to justify a departure in a particular case or to facilitate appellate review. But this sort of detailed justification is not *required* by the Legislature's statutory scheme, which *only* requires a court to "ha[ve] a substantial and compelling reason for that departure and state[] on the record the reasons for departure." MCL 769.34(3).[18]

---

[18] This Court consistently and rightly criticizes such deviations from the Legislature's intent as expressed in its unambiguous statutory text. For a prime example, this Court rejected courts' attempts to superimpose atextual, judicially created rules on unambiguous text in *Devillers v Auto Club Ins Ass'n*, 473 Mich 562; 702 NW2d 539 (2005), and *Rory v Continental Ins Co*, 473 Mich 457; 703 NW2d 23 (2005). *Devillers* and *Rory* addressed the line of cases beginning with *Tom Thomas Org, Inc v Reliance Ins Co,* 396 Mich 588; 242 NW2d 396 (1976), in which courts allowed for judicial tolling of unambiguous time periods established by statute and contract. *Devillers* overruled *Lewis v DAIIE,* 426 Mich 93; 393 NW2d 167 (1986), because *Lewis* impermissibly grafted a judicial tolling doctrine onto a provision of the no-fault act, MCL 500.3145(1), that plainly afforded claimants one year from the time a loss was incurred recover benefits. *Devillers* at 581. In doing so, *Devillers* "reaffirm[ed] the Legislature's prerogative to set policy and our long-established commitment to the application of statutes according to their plain and unambiguous terms to preserve that legislative prerogative." *Id.* Indeed, we appropriately characterized the *Lewis* Court's superimposition of judicial tolling on the unambiguous statute as "crafting its own amendment" of the statute. *Id.* at 582. In *Rory,* we similarly overruled the attempts of *Tom Thomas* and its progeny to "abrogate unambiguous contractual terms" using "judicial assessment[s] of 'reasonableness.'" *Rory* at 470. Thus, in

(continued…)

Indeed, the majority today creates a corollary guidelines scheme for departure sentences from whole cloth and imports it through a single word—"that"—in MCL 769.34(3) ("*that* departure").

The nature of the requirements of the plain text of the statutes, which the majority's holding ignores, reflects the fact that the Legislature continues to grant sentencing discretion to trial courts, even in the wake of legislatively enacted sentencing guidelines, because each case is unique and only the trial judge is directly familiar with the facts and circumstances of the offense and offender. See *Babcock*, 469 Mich at 270. They also reflect the difficulty of quantifying individualized sentences.

---

(…continued)

both cases we recognized that we lack the power to import our own enhancements or exceptions when the Legislature or contracting parties have clearly established a governing regime.

The statutory requirements for imposing and reviewing departure sentences that we address here are equally clear. The *Tom Thomas* line of cases permitted judicial tolling to thwart the clear time periods circumscribing parties' duties and rights as established by contract or statute. Here, the Legislature clearly circumscribes a court's sentencing duties by requiring it to articulate substantial and compelling reasons to depart. And it further directs that appellate review of the departure is done by analyzing the record, not charting a defendant's placement on a continuum. Yet the majority expands these clearly defined duties by imposing judicially created guidelines for departure. By doing so, the majority fails to recognize that this Court's duty is to apply the statutory language "without addition, subtraction, or modification." *Lesner v Liquid Disposal, Inc*, 466 Mich 95, 101; 643 NW2d 553 (2002). "We may not read anything into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Id.*

The United States Supreme Court recently provided guidance concerning how appellate courts may meaningfully review sentencing decisions while preserving trial courts' sentencing discretion in *Gall v United States*, 552 US ___; 128 S Ct 586; 169 L Ed 2d 445 (2007). Although the federal sentencing guidelines differ from the Michigan scheme and are no longer mandatory, federal judges must consult the guidelines and, as in Michigan, a departure from the specified range is reviewed for an abuse of discretion. *Id*. at ___; 128 S Ct at 594. Appellate courts defer to trial courts' sentencing discretion in part due to practical considerations. As the *Gall* Court observed:

> "The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." Brief for Federal Public and Community Defenders et al. as *Amici Curiae* 16. "The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court." *Rita* [*v United States*, ___ US __; 127 S Ct 2456, 2469; 168 L Ed 2d 203 (2007)]. Moreover, "[d]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines sentences than appellate courts do." *Koon v. United States,* 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). [*Id*. at ___; 128 S Ct at 597-598.]

While acknowledging that "appellate courts may . . . take the degree of variance into account and consider the extent of a deviation from the Guidelines," the *Gall* Court "reject[ed] the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Gall*, 552 US at ___; 128 S Ct at 595. Most

27

significant to our purposes, the Court observed that mathematical approaches "assume[] the existence of some ascertainable method of assigning percentages to various justifications." *Id*. at ___; 128 S Ct at 596. "The [percentage] formula is a classic example of attempting to measure an inventory of apples by counting oranges." *Id.*

I fear that the majority today similarly attempts to measure apples by counting oranges. Although rooting a departure sentence in the factors considered by the Michigan sentencing guidelines may be helpful in a given case, it will often be antithetical to courts' ability to exercise their sentencing discretion. For instance, how can a trial or appellate court measure the extent of departure appropriate for the level of exploitation present in this case? Should defendant's act of extorting silence from the child—in the words of the majority, of "forc[ing] the child to choose between reporting the defendant's repeated criminal assaults and protecting her family from homelessness," *ante* at 9—be weighed at twice the maximum score for OV 10? Ten times that score? I agree with the majority that proportionality is in part rooted in the egregiousness of the offense, *ante* at 13, quoting *Babcock* at 263, and therefore that relatively higher sentences will be warranted for offenders with lower prior record variable scores whose egregious crimes nonetheless are not adequately contemplated by the OV scores, *ante* at 17-18. But I fail to see how Judge Kenny fell short in his obligation to "comply *reasonably* with [his] obligations under the guidelines," *ante* at 29-30, when he

28

explained in detail his reasons for concluding that this defendant is precisely such an offender.

Indeed, complying with the majority's regime will be essentially impossible in the many cases where trial courts depart on the basis of unique characteristics that are not contemplated by the guidelines at all and not present for comparison in other cases. I respectfully suggest that here Judge Kenny could do no more than point to the record of this heinous case of abuse to explain his reasons for departing under these unique circumstances. No amount of charting the offense by reference to the guidelines would reveal a correct departure sentence or departure range because we cannot quantify the circumstances of this crime or the exploitation involved. Individualized sentencing often simply is not amenable to this level of precision and further articulation by the trial court would not meaningfully aid in review.[19] As stated by *Fields* and reflected in MCL

---

[19] In his partial dissent from the *Babcock* decision, Justice Cavanagh similarly stressed the futility of imposing artificial limitations on a trial judge's discretionary sentencing decisions, albeit by *rejecting* the majority's conclusion that reasons for departure must be objective and verifiable and suggesting an even more deferential approach. *Babcock*, 469 Mich at 279 (Cavanagh, J., dissenting in part). Justice Cavanagh observed:

> [W]hat rises to the level of substantial and compelling is clearly subjective. "It relates to *this* defendant and to *this* sentencing judge, who is examining *this* individual and *this* offense." [*Fields,* 448 Mich at 104 (Cavanagh, J., dissenting)] (emphasis in original). Thus, the weighing of all the factors and circumstances before the sentencing court includes inherently subjective inquiries.

(continued…)

769.34(11), the requirement that a trial court state attention-grabbing, objective and verifiable reasons for departure *itself* "provides sufficient restrictions to assure that the Legislature's intent . . . will not be subsumed by the use of what is intended to be an exception to the rule . . . ." *Fields*, 448 Mich at 68-69.

To the extent the majority asserts that its regime is necessary to facilitate proportionality, it appears to ignore that the *Babcock* decision thoroughly considered the goal of proportionality when it established abuse of discretion as the appropriate standard for review of sentencing departures. *Ante* at 12-13; *Babcock*, 469 Mich at 261-264. In *Gall,* the United States Supreme Court approved of its decision in *Koon* to adopt an abuse of discretion standard of review. The *Gall* Court observed: "Even [in *Koon*] we were satisfied that a more deferential *abuse-of-discretion standard could successfully balance the need to 'reduce unjustified disparities'* across the Nation and 'consider every convicted person as an individual.'" *Gall*, 552 US at ___; 128 S Ct at 598 n 8, quoting *Koon,* 518 US 113 (emphasis added).

(…continued)

> Further, . . . [t]here are certain factors, such as a defendant's remorse or a defendant's family support, that may be considered objective by one sentencing judge and subjective by another. The dissent in *Fields* stated, "[t]he better test is whether the sentencing judge is satisfied that the nature and extent of the defendant's remorse [or family support] are substantial and compelling reasons to support a sentencing departure." *Id*. at 105. I remain committed to the position that the "objective" criteria utilized by this Court is [sic] unworkable. [*Id.* at 279-280.]

Contrary to the majority's approach, Michigan law—like federal law—requires simply that a trial court "adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 US at ___; 128 S Ct at 597; see also *Babcock* at 259 n 13 ("[H]owever it is articulated, the quality of the trial court's statement must be sufficient to allow for effective appellate review."). Because of the intangible nature of sentencing factors, adequate explanation is all we can ask of trial courts. Here Judge Kenny complied with the requirements of MCL 769.34(3) by stating his intention to depart and his reasons for departure. He complied with MCL 759.34(3)(b) by explaining that the guidelines did not adequately cover the circumstances of the offenses. He aided appellate review by explaining his reasons for departure in detail and explicitly recognizing his duties under *Babcock*. By requiring still more from trial judges, the majority now imposes an unreasonably burdensome task on parties and judges, who will be required to debate the specific degree to which the guidelines are over- or under-inclusive of particular factors and quantify the effect of factors not addressed by the guidelines. Yet, because these issues are not easily quantifiable, appellate courts will remain able only to answer the central questions: does the record reflect that the trial court had a substantial and compelling reason to depart and, if so, was the sentence outside the range of principled outcomes? MCL 769.34(11); *Babcock*, 469 Mich at 269. The majority thus assigns litigants and trial judges a time-consuming and potentially impossible task that is irrelevant

31

to the statutory directives concerning a trial judge's substantial and compelling reasons for departure.

I would retain the current, workable standard. As in the federal context, an appellate court

> may consider the extent of the deviation [from the guidelines], but must give due deference to the [trial] court's decision that the [sentencing] factors, *on a whole,* justify the extent of the variance. *The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal* . . . . [*Gall*, 552 US at ___; 128 S Ct at 597 (emphasis added).]

This prohibition on an appellate court substituting its judgment for that of the trial court constitutes the very heart of the abuse of discretion standard of review. Because the sentences imposed fall within the range of reasonable opinions regarding what sentences are appropriate in this case, they do not constitute an abuse of discretion. Accordingly, I would affirm defendant's sentences.

Maura D. Corrigan

32